IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| JONATHAN GRAYSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 13 C 1705 |
| | ) | |
| CITY OF AURORA, et al., | ) | Judge Virginia M. Kendall |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jonathan Grayson[1] was wrongfully convicted of murder on November 7, 2002 in Kane County, Illinois. He proceeded to serve more than eleven years in prison for a crime he did not commit. After new evidence prompted a reinvestigation of Grayson's case, the Kane County State's Attorney's Office moved to vacate Grayson's conviction. On March 6, 2012, the State of Illinois agreed and exonerated Grayson from the murder conviction. After his exoneration, Grayson filed suit against the City of Aurora and Aurora Police employees T. Kearbey, Robb Wallers, Alvin Soto, Thomas Kinney, Rick Robertson, Dan West, John Thompson, and Michael Gumz, alleging a number of claims under 42 U.S.C. § 1983 and state law.[2] Specifically, Grayson alleges that the Defendants denied him a fair trial in violation of his Due Process rights by withholding exculpatory evidence, fabricating evidence and crafting false and misleading reports, using unduly suggestive identification procedures, and coercing him into giving a false confession. Grayson also asserts constitutional claims for supervisory liability, failure to

---

[1] At the time of the underlying investigation and conviction, Grayson went by the name Jonathan Moore.
[2] Grayson voluntarily dismissed Kearbey, Gumz, Thompson, Kinney, and Soto as defendants in his response to the Defendants' motion for summary judgment. (Dkt. No. 187 at 30 n.30.)

intervene, conspiracy to deprive him of his constitutional rights, and conspiracy to deny access to courts. Grayson additionally brings state law claims for malicious prosecution, negligent supervision, conspiracy, intentional infliction of emotional distress, respondeat superior, indemnification, and spoliation.

The remaining defendants (the City of Aurora, Wallers, Robertson, and West) now move for summary judgment on all of Grayson's claims pursuant to Federal Rule of Civil Procedure 56, arguing that they are entitled to judgment as a matter of law because there is no issue of material fact concerning whether they had probable cause to investigate, prosecute, and ultimately aid in the conviction of Grayson. Grayson does not dispute summary judgment on his supervisory liability claim (Count II), negligent supervision claims (Count VI), or his *Monell* claim, styled as respondeat superior (Count IX). Those three counts are accordingly dismissed. Additionally, the Court grants summary judgment to the Defendants on Grayson's conspiracy claims (Counts IV & VIII), intentional infliction of emotional distress claim (Count VIII), and spoliation claim (Count XI). However, for the reasons that follow, the remainder of the Defendants' motion is denied. The Court therefore grants the Defendants' motion for summary judgment (Dkt. Nos. 159 & 177) in part and denies it in part.[3]

## BACKGROUND

The Court takes the following facts from the parties' Local Rule 56.1 statements and exhibits. The facts are undisputed unless expressly noted.

### A.     The Underlying Incident

Just before 6 a.m. on August 24, 2000, Aurora Police Officers Lawrence Suttle, Brian Pierce, and Jeff Schoeberlen received and responded to a report of gunshots near the Lincoln

---

[3] The City of Aurora's motion for summary judgment is granted in all respects except for Grayson's Illinois state law indemnification claim.

Laundromat at 15 S. Lincoln Avenuew in Aurora, Illinois. (Def. 56.1 St. ¶ 3.) The officers encountered Shaun Miller, Leroy Starks, and Marilou Alvorado once they arrived on scene. (Def. 56.1 St. ¶ 4.) Miller was nonresponsive[4], but Starks was conscious despite having been shot in his leg and chest. (*Id.*; Def. 56.1 St. ¶ 5.) Alvorado was unharmed. (Def. 56.1 St. ¶ 4.) Later, Starks testified that he did not remember speaking to the police either on scene or in the ambulance, but Aurora officers may have asked him if he knew who shot him. (Def. 56.1 St.¶ 5; Pl. Resp. ¶ 5.) Starks did not tell any officer that he knew the shooter. (Pl. Resp. ¶ 5.) While in the ambulance, Starks called his brother and currently claims that he told his brother an individual named Flip shot him, but he did not pass this information along to the police. (*Id.*) The paramedics on scene did not recall Starks talking about the incident while in the ambulance, but stated that if they had, they would have documented the communication. (Def. 56.1 St. ¶ 6; Pl. Resp. ¶ 6.)

After ambulances and emergency vehicles arrived on scene, Alvorado left and later returned. (Def. 56.1 St. ¶ 10.) The reason for her departure is disputed: at Grayson's criminal trial, Alvorado testified that the police took her to the station in handcuffs because she was not cooperative, while in her 2014 deposition, she stated she was never forced to speak. (Pl. Resp. ¶ 10; 2014 Alvorado Dep. at 337-38.) Alvorado returned to the scene with Maurice and Melissa Matthews. Pierce documented in a report that Maurice yelled that Alvorado had told him that Flip was the shooter. (Def. 56.1 St. ¶ 11.) Grayson has used the nickname Flip since he was a child. (Def. 56.1 St. ¶ 12.)

---

[4] Miller died from the gunshot wounds he suffered on August 24, 2000.

### B. The Investigation

#### 1. Leroy Starks

Officer Marshall Gauer spoke with Starks in the hospital the morning of the shooting. (Def. 56.1 St. ¶ 22.) Starks gave a physical description of the shooter but did not name Grayson as the shooter. (Def. 56.1 St. ¶ 22.) Starks additionally told Gauer that Eric Greene, known as Peanut, was driving around the block near the Lincoln Laundromat before the shooting. (Def. 56.1 St. ¶ 23.)

On August 25, 2000, Aurora police interview Starks at the hospital again. (Def. 56.1 St. ¶ 41.) Starks told Wallers that the shooter was about 5'9", had big eyes and a big nose, and was wearing a white striped shirt and purple shorts, which was different than Alvorado's account. (Def. 56.1 St. ¶ 41.) Starks did not tell Wallers that he knew who the shooter was or that it was someone he knew as Flip, but eventually selected Grayson's photo from a lineup. (Pl. Resp. ¶ 41; Def. 56.1 St. ¶ 42.) Grayson contends that in the lineup Wallers showed Starks, he had the biggest eyes.

Starks's identification of Grayson without telling officers his name raises factual issues. Starks testified that he told his brother that Flip shot him while he was in the ambulance, yet he neglected to tell police officers either of the first two times he was interviewed. Moreover, Starks stated that he had met Grayson once, while Grayson testified that he knew Starks before the shooting and had interacted with him multiple times. (Def. 56.1 St. ¶ 45; Pl. Resp. ¶ 45.) Alvorado's description of their relationship fell much closer to Grayson's interpretation.

#### 2. Marilou Alvorado

Just after the incident on August 24, 2000, Alvorado spoke to Suttle and told him that she had been with Miller and Starks. (Def. 56.1 St. ¶ 7.) The parties heavily dispute whether

Alvorado was present for the shooting. Alvorado stated she was, but Starks maintained that Alvorado was not in the vicinity during the actual shooting because she left to make a phone call. (Pl. Resp. ¶ 93.) Suttle's police report stated that Alvorado described the shooter as a 5'8" Black male wearing tan pants, a flannel shirt, and black headwear. (Pl. Resp. ¶ 7.) Alvorado also told Suttle that she recognized the shooter but did not know his name. (Def. 56.1 St. ¶ 7.) Suttle's report indicated that there were no other witnesses directly on scene when he took Alvorado's statement. (Def. 56.1 St. ¶ 7.) Alvorado later testified that she was afraid to name Grayson as the shooter because she believed the police would not be able to take him into custody right away. [5] (Def. 56.1 St. ¶ 8; Def. Ex. 7, 2014 Alvorado Dep. at 12; Def. 56.1 St. ¶ 24.) However, Alvorado told multiple people, including her friend, Melissa, and police that the shooter was not Flip, but that the shooter "looked like Flip, but taller." (Pl. Resp. ¶ 8.) A report written by Wallers documented that Alvorado flatly denied telling anyone that Flip was the shooter. (Pl. Resp. ¶ 11.) Melissa told law enforcement that she was "pretty sure if [Alvorado] knew who [the shooter] was . . . she would say it." (Pl. Resp. ¶ 8.) Alvorado testified in 2014 that she would have been willing to identify Flip as the shooter even if she had not made arrangements to leave the state. (Pl. Resp. ¶ 8.)

At the hospital, Gauer wrote a report stating that Melissa told him to look for Peanut and Flip. (Def. 56.1 St. ¶ 25.) However, in this same conversation, Alvorado told Gauer that "it wasn't Flip because he wasn't tall enough." (Gauer Dep. at 81.) Alvorado proceeded to meet with police at least three times concerning the incident. (Def. 56.1 St. ¶ 27.) In her first interview on August 24, 2000, she claimed she was present at the scene of the shooting but she did not identify Grayson as the shooter. (Def. 56.1 St. ¶ 28.) At some point, Wallers ran the name Flip through the Aurora Police Department's records system at 7:35 a.m. on August 24, 2000.

---

[5] This statement, however, is directly contradicted by her later identification of Eric Greene, who was not in custody.

(Def. 56.1 St. ¶ 30.) The parties dispute whether this search took place before or after Wallers's first interview with Alvorado. (Def. 56.1 St. ¶ 30; Pl. Resp. ¶ 30.)

On August 26, 2000, Alvorado contacted Wallers and told him she had been approached by Greene, who told her that Grayson had called him from jail and informed him that Alvorado had implicated the two of them in the shooting. (Def. 56.1 St. ¶ 56.) Alvorado went to the police station to look at some photo lineups after telling officers she could identify the shooter if she saw him. (Pl. Resp. ¶ 57.) Alvorado did not identify Grayson as the shooter either in a photo lineup or a more general "Gang Book," but when Wallers asked her if she saw Flip (Grayson) in the Gang Book, she pointed him out. (Def. 56.1 St. ¶ 57.) Alvorado did, however, positively identify Greene in another photo lineup, despite the fact that he was not in custody and had in fact just confronted her about the incident. (Pl. Resp. ¶ 57.)

Alvorado spoke with Wallers again on August 29, 2000. (Def. 56.1 St. ¶ 80.) Alvorado gave a videotaped statement where she finally identified Grayson as the shooter, although the parties dispute whether Wallers interviewed her beforehand. (Def. 56.1 St. ¶ 80; Pl. Resp. ¶ 80.) Even during this interview, Alvorado failed to identify Grayson as the shooter her first try. When Wallers initially presented Alvorado with the photo lineup containing Grayson's picture, she said she did not see the shooter. (Pl. Resp. ¶ 80.) Wallers then asked if Alvorado recognized anyone in that lineup, and she said she knew Flip (Grayson). (Pl. Resp. ¶ 80.) Wallers eventually asked Alvorado again if she recognized Flip, to which she replied in the affirmative, and then he again asked if Flip shot Miller and Starks. At this point, Alvorado said yes. (Pl. Resp. ¶ 80.)

Alvorado's failure to identify Grayson as the shooter from the beginning raises a factual dispute. The Defendants characterize her hesitance as emanating from fear, but Alvorado's identification of Greene while he was not in custody conflicts that theory. What is undisputed is

that Alvorado knew Grayson well; for about four months in 2000, Grayson kept some belongings at Alvorado's home and sometimes slept, ate, and showered there. (Def. 56.1 St. ¶ 81; Pl. Resp. ¶ 81.) Grayson was a close friend of Alvorado's boyfriend, but she kicked him out of her home around two months before the incident. (Pl. Resp. ¶ 81.)

After Grayson's conviction, Alvorado was permitted to leave the state despite being on probation. The Defendants contend that Alvorado was not given any money or consideration in exchange for her testimony, but Commander Nelson of the Aurora Police Department testified that Alvorado did, in fact, receive consideration for her cooperation but he did know what it was. (Def. 56.1 St. ¶ 113; Pl. Resp. ¶ 113.)

### 3. Melissa Matthews

Melissa was not a witness to the shooting and any information from her was only gained from Alvorado. (Pl. Resp. ¶ 25.) On August 24, 2000, Officer West interviewed Melissa twice, despite her lack of involvement with the shooting. (Def. 56.1 St. ¶31; Pl. Resp. ¶ 31.) West testified that his police report stated that Matthews told West that although she did not have personal knowledge of the incident, Alvorado had told her that the shooter looked like Flip but was taller. (Def. 56.1 St. ¶ 31.)

On August 27, 2000, West interviewed Melissa at the Kane County Correctional Facility and recorded part of the interview. (Def. 56.1 St. ¶ 67.) Again, Melissa explained that she had not witnessed the shooting, but that Alvorado had relayed to her that the shooter "looked like Flip but he was taller." (Def. 56.1 St. ¶ 67.) West attempted to clarify Melissa's statement by asking if the shooter "might have been Flip," but Melissa cut him off and told him: "Flip, but he was taller. She said that exactly. It looked like Flip, but he was taller." (Pl. Resp. ¶ 67.)

### 4.     Karen Langley

Langley awoke to gunshots the morning of the shooting. (Pl. Resp. ¶ 16.) She called the police just before she heard a "commotion" and "footsteps like people running." (Pl. Resp. ¶ 16.) Around twenty minutes after the shooting, Officer Darrel Moore canvassed the area surrounding the Lincoln Laundromat. (Def. 56.1 St. ¶ 14.) He spoke to Karen Langley, who lived in an apartment next to the Laundromat. (Def. 56.1 St. ¶ 14; Pl. Resp. ¶ 14; Pl. Resp. ¶ 16.) Langley does not remember speaking to any police officer in person the day of the incident, but Moore's canvass report states that Langley told him she heard six gunshots, observed a Black male wearing a white no sleeve shirt and black pants near her residence, and laughter. (Def. 56.1 St. ¶¶ 15, 17.) Moore's canvass report was disclosed to Grayson's criminal defense attorney. (Def. 56.1 St. ¶ 17.)

She cannot remember all the details, but Langley does remember calling 911 after she heard the gunshots where she told the operator she had heard a number of gunshots. (Def. 56.1 St. ¶ 18.) Langley's 911 call was disclosed to Grayson's criminal defense attorney. (Def. 56.1 St. ¶ 18.) However, Langley additionally testified that she called the non-emergency number of the Aurora Police Department about an hour after her 911 call and reported to the operator a recount of what she had seen. (Pl. Resp. ¶ 15.) Langley's apartment was near the back of her building and she did not have a view out toward the front. (Def. 56.1 St. ¶ 16.) Instead, Langley had a direct view of the rear porch of the Ballines' residence, the house across the way from her window. (Pl. Resp. ¶ 16; Pl. 56.1 St. ¶ 6.) Langley testified that she told the non-emergency operator that, after the shooting, she saw a cab pull up to the home across the alley from her house and two Hispanic males climbed in the back seat and laid down in a suspicious manner. (Pl. Ex. 13, Langley Dep. at 10; Def. 56.1 St. ¶ 21.) The operator transferred Langley to who she

believed was a detective working on the case.[6] (Langley Dep. at 10.) Along with telling the detective the same information Langley provided to the operator, she gave the detective a description of the cab and its paint, the cab number written on the side of the vehicle, the cab's license plate number, and the direction in which the cab drove off. (Langley Dep. at 10.) Langley additionally testified that she told the police that one of the men had a cast on his arm, although the 911 call does not reflect that. (Langley Dep. at 12; Def. 56.1 St. ¶ 18.) There is no evidence in the record that the Aurora Police Department disclosed Langley's non-emergency call or the information contained therein to Grayson in advance of his criminal trial, and the Ballines are not referenced in any police report. (Pl. 56.1 St. ¶ 15.)

### 5.  Jennifer Pitts

Around 9 a.m. the morning of the shooting, Officers Thompson and Hester located Pitts as a potential witness in the case. (Def. 56.1 St. ¶ 33.) The officers brought Pitts to the police station where Wallers and Officer Kearbey interviewed her. (Def. 56.1 St. ¶ 34.) Pitts told Wallers that Greene picked her up near the Laundromat, that she overheard the gunshots, and that she saw an unknown subject run from the scene. (Def. 56.1 St. ¶ 34; Pl. Resp. ¶ 34.) She gave a similar statement on August 27, 2000. (Def. 56.1 St. ¶ 58.)

### 6.  Carlos Aguilera

At 10:15 p.m. on August 24, 2000, Wallers interview Aguilera. (Def. 56.1 St. ¶ 35.) In the interview, Aguilera stated that he saw two men run toward the back of his apartment building next to the Laundromat after he heard gunshots. (Def. 56.1 St. ¶ 37.) Wallers showed Aguilera a photo lineup with Grayson's picture in it, but Aguilera did not identify him. (Def. 56.1 St. ¶ 38.)

---

[6] Wallers claims he never interviewed Langley nor listened to the 911 tape during his investigation. In viewing the facts in the light most favorable to Grayson, the Court accepts that either Wallers or another detective on the Laundromat case spoke with Langley. Wallers, as the lead detective, was tasked with maintaining the working file on the case. (Pl. 56.1 St. ¶ 23.)

In fact, Aguilera identified a lineup "filler." (Def. 56.1 St. ¶ 38.) Wallers found Aguilera credible after his interview. (Pl. Resp. ¶ 39.)

### C.       The Interrogations

Detective Richard Roberston arrested Grayson on August 26, 2000. (Def. 56.1 St. ¶ 46.) At the time, Aurora police were able to decide when to start recording a witness statement; there was no mandate to record all interaction. (Def. 56.1 St. ¶ 47; Pl. Resp. ¶ 47.) Robertson took Grayson to the precinct and Grayson eventually signed a *Miranda* rights waiver, although Grayson testified that he was not read his *Miranda* rights until after the officers started recording an already-ongoing interview. (Def. 56.1 St. ¶ 48; Pl. Resp. ¶ 48.) A portion of Grayson's first interrogation was videotaped, starting at 6:08 a.m. on August 26, 2000. Grayson told the interviewing officers that he was sleeping in a friend's garage at the time of the shooting and that he had heard that Greene or Adrian Moore shot at some rivals near the Laundromat. (Def. 56.1 St. ¶ 49.) While Wallers created photo lineups with Greene's and Moore's photos in them based on Grayson's statement[7], the investigating officers never sought to interview either Green or Moore because they thought Grayson's statements were false. (Def. 56.1 St. ¶¶ 53, 75; Pl. Resp. ¶ 53.)

Grayson asserts that Wallers interrogated him at length before starting the recording and that, although he denied any involvement in the shooting, he felt like he needed to implicate other people based on the officers' feeding him information. (Pl. Resp. ¶ 51.) Grayson maintains that West told him he needed to place himself in the crime in order to help himself. (Pl. Resp. ¶ 52.) He testified that West and Wallers gave him some words to go off of and that he supplemented their version when he was being recorded. (Pl. Resp. ¶ 52.) Grayson further

---

[7] Starks positively identified Greene in a photo lineup while he was in the hospital. (Def. 56.1 St. ¶ 75.)

testified that the officers would only record his statement once he had said what they wanted him to say. (Pl. Resp. ¶ 52.)

Wallers interrogated Grayson again on August 27, 2000 around 6 p.m. (Def. 56.1 St. ¶ 59.) Grayson told Wallers that he saw Greene do the shooting and, when confronted, Grayson broke down and asked to end the interview. (Def. 56.1 St. ¶ 59.) Later that same day, Grayson contends that when speaking with West unrecorded, West told him that if he would help them, West would help him and send him home. (Def. 56.1 St. ¶ 60.) Grayson then provided a second recorded statement. (Def. 56.1 St. ¶ 61.) This time, Grayson stated that he was present on scene while Adrian Moore was responsible for the shooting, but Grayson later testified that he was trying to supplement the information the officers were feeding him and provide them the story they were looking for. (Def. 56.1 St. ¶ 62; Pl. Resp. ¶ 62.) Grayson testified that he took the officers' "information and said somebody else because they said give them a shooter, I go home."[8] (Pl. Resp. ¶ 63.) Grayson claims he made up a narrative about the location of the murder weapon along these same lines. (Def. 56.1 St. ¶ 66.)

Grayson had his initial hearing on August 28, 2000 and spoke with West directly thereafter. (Def. 56.1 St. ¶ 70.) This third interview was also recorded, although the parties dispute whether it was recorded in its entirety. (Def. 56.1 St. ¶ 71; Pl. Resp. ¶ 71.) In his third statement, Grayson reverted to his original story and told West that his original alibi was true and that his other statements were false. (Def. 56.1 St. ¶ 72.)

Regarding his treatment while in Aurora's custody, the parties do not dispute that the officers did not physically abuse Grayson. (Def. 56.1 St. ¶ 73.) However, he was occasionally forced to wait to use the restroom and Grayson claims he received severely inadequate food.

---

[8] Grayson also testified that the officers fed him the caliber of the murder weapon, and when they gave him the wrong caliber initially, they demanded he change the caliber of gun in a recorded interrogation. (Pl. Resp. ¶ 63.)

(Def. 56.1 St. ¶ 73; Pl. Resp. ¶ 73.) Grayson testified that during those first three days, he was "starving" and consistently asked for food but was denied. (Pl. Resp. ¶ 73.) In 2001, Grayson's I.Q. test returned a score of 89 and indicated that he was not mentally disabled. (Def. 56.1 St. ¶ 124.) However, he received borderline scores for verbal I.Q. and struggled in his knowledge of conventional social standards and his ability to pay attention. (Pl. Resp. ¶ 124.) The psychologist who conducted his test testified that Grayson may have issues interacting with people, expressing himself, and approaching interrogations. (Pl. Resp. ¶ 124.) Grayson had only gone to school through the sixth grade and was placed in special education classes. (Pl. Resp. ¶ 124.) The psychological test did demonstrate that Grayson could likely understand the jeopardy associated with custodial interrogation. (Def. 56.1 St. ¶ 125.) However, Grayson scored well below the mean regarding his understanding of the protections related to the right to remain silent. (Pl. Resp. ¶ 125.)

### D. Grayson's Criminal Trial

Leading up to trial, Aurora police recovered a gun from Sergio Contreras that was forensically linked to the Laundromat shooting and a separate discharge of the same firearm. (Def. 56.1 St. ¶¶ 86-87.) Grayson's criminal defense attorney was made aware of the gun's existence, but Grayson asserts that Wallers did not ask any witnesses connected with the other discharge any questions about the Laundromat incident. (Pl. Resp. ¶ 87.) Contreras testified at his deposition that he was unaware of the gun's connection to the Laundromat until 2011. (Def. 56.1 St. ¶ 89.)

Grayson's trial took place in August 2002 after the prosecution disclosed that Alvorado and Starks would identify him at trial. (Def. 56.1 St. ¶ 90; Pl. Resp. ¶ 90.) Alvorado testified that she witnessed Grayson, alone, shoot Miller and Starks and that he proceeded to point his gun at

her and pull the trigger on an empty magazine.[9] (Def. 56.1 St. ¶ 9.) She testified that she was close enough to touch Grayson when he began shooting. (Def. 56.1 St. ¶ 93.) The parties dispute whether Alvorado received consideration for her testimony, but if she had, there is no record evidence that it was disclosed prior to trial. Starks testified at Grayson's criminal trial and identified Grayson as the shooter. (Def. 56.1 St. ¶ 76.) Starks testified that while he was very close to the shooter at the time of incident, Alvorado was not present because she had left to make a phone call. (Def. 56.1 St. ¶ 92.) Starks testified that he was not offered anything in exchange for his testimony, but there is record evidence that Wallers told Starks he was not going to charge him with drug possession based on the circumstances of the incident. (Pl. Resp. ¶ 77.) Wallers did not document that communication in any report. (Pl. Resp. ¶ 77.)

There was no physical or forensic evidence tying Grayson to the incident. Nevertheless, Grayson was convicted and the Illinois Court of Appeals affirmed over Grayson's challenge to the sufficiency of the evidence. (Def. 56.1 St. ¶ 94.) In so holding, the appellate court noted that Alvorado's and Starks's testimony and rendition of events conflicted but that "resolving such issues if the function of the jury[.]" (Pl. Resp. ¶ 94.)

E.       **The Re-Investigation**

The Aurora Police Department initiated a reinvestigation of the Laundromat incident in 2011 based on, in part, a letter from Ernesto Urzua. (Def. 56.1 St. ¶ 95.) Wallers eventually possessed the letter and passed it on to detectives John Munn and Darrell Moore. (Def. 56.1 St. ¶ 96.) Urzua's letter, along with any copies that ever existed, is missing. (Def. 56.1 St. ¶ 97.) The Defendants claim that in the letter, Urzua stated he wanted to speak with a detective concerning

---

[9] Alvorado testified slightly inconsistently at her 2014 deposition. She stated that the shooter shot at her and Starks first, then unloaded the rest of his ammunition on Miller. (2014 Alvorado Dep. at 121.)

old murders. (Def. 56.1 St. ¶ 98.) Grayson disputes the content of the letter because he was never given an opportunity to inspect it and it is now missing. (Pl. Resp. ¶ 98.)

Munn and Moore visited Urzua in Stateville Correctional Center and interviewed him on the Laundromat shooting. Urzua told the detectives that he was present when another individual, Quentin Moore, shot the individuals that Grayson was convicted of murdering. (Def. 56.1 St. ¶ 100.) The detectives shared this information with the Kane County State's Attorney's Office ("KCSAO"), and the KCSAO eventually conducted its own re-investigation. (Def. 56.1 St. ¶ 101; Pl. Resp. ¶ 101.) At his deposition for this case, Urzua invoked his Fifth Amendment privilege against self-incrimination regarding all substantive questions about the Laundromat shooting, but before the deposition, Munn and Moore testified that Urzua stated that he and Quentin were the only people responsible for the crime. (Def. 56.1 St. ¶ 102; Pl. Resp. ¶ 102.) Munn and Moore additionally visited Alvorado at her home, unannounced, and interview her. (Def. 56.1 St. ¶ 103.) The detectives testified that Alvorado's story was inconsistent and that she was "not very cooperative[.]" (Pl. Resp. ¶ 103; Munn Dep. at 119.) Munn and Moore stated that Alvorado told them there were two perpetrators involved in the shooting, but Alvorado maintains that she never said that.[10] (Def. 56.1 St. ¶ 107.) Munn additionally testified that Alvorado told him that she told the investigators in 2000 that there were two gunmen, not one. (Munn Dep. at 118-120.)

Munn and Moore authored a report documenting all this information. (Def. 56.1 St. ¶ 106; Pl. 56.1 St. ¶¶ 2-5, 11-14.) Munn reported that Urzua and Quentin went to the Ballines'

---

[10] Munn's written statement that Alvorado told him in this in 2011 would be inadmissible hearsay. Moreover, even if Alvorado testified at trial that she told the Aurora police this information in 2000, her statement would still constitute hearsay without any exception because it would be offered for the truth of the matter asserted; that is, that she did in fact tell police that information.

home after shooting Miller and Starks. (Pl. 56.1 St. ¶ 12.) Ballines later testified that Urzua and Quentin left the scene in a cab when "[e]verything was like cooling off." (Pl. 56.1 St. ¶ 16.)

Officer Munn, an Aurora Police Department officer himself, testified that he did not find Starks' original identification right after the incident to be credible based on the area the shooting occurred in, the time of the incident, the lighting in the area, and accounts from other witnesses. (Pl. Ex. 2, Munn Dep. at 148.)

### F.     Grayson's Exoneration

The KCSAO moved to vacate Grayson's conviction on March 6, 2012 and the charges were dismissed. (Def. 56.1 St. ¶ 112.) The State of Illinois issued Grayson a Certificate of Innocence in March 2014. (Pl. Resp. ¶ 112.)

## LEGAL STANDARD

Summary judgment is appropriate where the admissible evidence shows that no genuine dispute exists as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "A 'material fact' is one identified by the substantive law as affecting the outcome of the suit." *Bunn v. Khoury Enters., Inc.,* 753 F.3d 676, 681 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "A 'genuine issue' exists with respect to any such material fact, and summary judgment is therefore inappropriate, when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bunn,* 753 F.3d at 681–82 (citing *Anderson,* 477 U.S. at 248). Conversely, "where the factual record taken as a whole could *not* lead a rational trier of fact to find for the nonmoving party, there is nothing for a jury to do." *Bunn,* 753 F.3d at 682 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (emphasis in original)).

In determining whether a genuine issue of material fact exists, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *See Bunn,* 753 F.3d at 682 (citing *Anderson,* 477 U.S. at 255); *see also Kvapil v. Chippewa County, Wis.,* 752 F.3d 708, 712 (7th Cir. 2014). With these standards in mind, the Court addresses the Defendants' motion.

## DISCUSSION

The Defendants have moved for summary judgment on all of Grayson's claims contained in his second amended complaint. They primarily make five arguments in support of their motion: (1) Grayson's due process claim is legally deficient; (2) to the extent they made reasonable mistakes, the Defendants are entitled to qualified immunity; (3) the record does not demonstrate the lack of probable cause or the existence of malice for his state law malicious prosecution claim; (4) they were under no duty to secure the Urzua letter; and (5) the remaining claims are primarily contingent and fall if they secure summary judgment on Grayson's due process and malicious prosecution claims. The Court addresses Grayson's claims in order.

### A.    Due Process Claim

Grayson asserts that the Defendants violated his due process rights and deprived him of a fair trial by withholding exculpatory evidence, using unduly suggestive identification procedures, fabricating evidence, and coercing him into giving false inculpatory statements. Grayson contends that the Defendants' conduct directly led to his wrongful conviction and therefore denied him his constitutional right to a fair trial. The Due Process Clause to the Constitution provides that criminal defendants are guaranteed the right to a fair trial and Grayson may pursue relief under 42 U.S.C. § 1983 for a violation of that constitutional right. *See Armstrong v. Daily*, 786 F.3d 529, 540 (7th Cir. 2015); *Alexander v. City of South Bend*, 433 F.3d 550, 555

(7th Cir. 2006); *Newsome v. McCabe*, 256 F.3d 747, 751-52 (7th Cir. 2001) (defendant does "not receive a fair trial if the prosecutors withheld material exculpatory details"). Section 1983 therefore "provides a remedy for certain forms of trial-based government misconduct based on violations of due process," because a "fair and impartial trial [is] guaranteed by the U.S. Constitution." *Ienco v. City of Chicago*, 286 F.3d 994, 998-99 (7th Cir. 2002). Here, material issues of fact surrounding whether the Defendants withheld exculpatory evidence and improperly coerced Grayson into falsely implicating himself in the Laundromat shooting make summary judgment inappropriate.

### 1.    Exculpatory Evidence

Pertinent to the allegations here, police officers are liable if they withhold material exculpatory evidence. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). Grayson must show three elements to prove a *Brady* violation: "(1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) the evidence must have been material, meaning there is a reasonably probability that the result of the proceeding would have been different." *Beaman v. Freesmeyer*, 776 F.3d 500, 506 (7th Cir. 2015). The third element is commonly referred to as "prejudice." *See Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008). "The reasonable probability standard for materiality of suppressed evidence is less rigorous than a preponderance of the evidence standard in that a petitioner need only show that the new evidence undermines confidence in the verdict." *Goudy v. Balsinger*, 604 F.3d 394, 399 (7th Cir. 2010) (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). In this case, disputed facts concerning (1) whether the Defendants were aware of and disclosed Langley's unrecorded non-emergency phone call, including the name of the owners of the Ballines' residence and (2)

whether Alvorado was compensated in any way for her criminal trial testimony and the Defendants failed to disclose this information to Grayson before his trial preclude summary judgment on Grayson's due process claim related to his *Brady* allegations.

As discussed above, Langley testified that on the morning of the Laundromat shooting, she called 911 directly after hearing gunshots and, approximately one hour later, called the Aurora police department's non-emergency line to disclose some suspicious behavior. Langley was a member of an Aurora neighborhood watch group at the time and was accustomed to calling this non-emergency line. She testified that she called the non-emergency line and was eventually transferred to a detective assigned to the Laundromat shooting. She recalled that the detective was a man, but could not remember his name. Langley testified that she told this detective that she witnessed two Hispanic men on the porch of Ballines' residence across the alley from her window. She said she noticed them after the shooting and witnessed them crawl into a cab, lie down in the back seat, and leave the area after the police presence calmed down. She testified that she told the detective the name of the cab company, the taxi number, the license plate number, and the direction in which the cab headed. Accepting at this stage, despite Langley's lessened recollection of the day now, that Langley called the non-emergency Aurora police line, gave an immensely detailed account of suspicious activity that she witnessed soon after the Laundromat shooting, and told the Aurora police that the suspicious individuals were sitting on the Ballines' porch, the Defendants were obligated to turn that information over to Grayson prior to his criminal trial. The Defendants failed to do so.

At the very least, Langley's detailed rendition of this event impeaches both Alvorado's and Starks's version of the events that involved a single, Black shooter who ran off after the shooting. Such information, if elicited at trial, would be material because it would cast doubt on

both eyewitnesses' versions.[11] Because Langley's statement, which the Court accepts she made to a detective assigned to the Laundromat shooting, would conflict with and impeach the witness testimony elicited at Grayson's criminal trial and was not disclosed to Grayson before the trial, a reasonable jury could find that the Defendants violated their *Brady* obligations. *See Beaman*, 776 F.3d at 506 (all three elements must be met).

Of utmost importance is the fact that the Ballines' potential involvement was never mentioned or disclosed on any police report to Grayson. (Pl. 56.1 St. ¶ 15.) Langley testified that she told Aurora police that the individuals were located on the Ballines' porch when she saw them and it is undisputed that this revelation did not occur on the 911 call that was disclosed to Grayson before his trial. The Defendants contend that Grayson is to blame for not questioning Langley in anticipation of his trial, *see Stinson v. Gauger*, 799 F.3d 833, 844-45 (7th Cir. 2015) ("Suppression does not occur when the defendant could have discovered it himself through reasonable diligence.") (citations and internal quotation marks omitted), but the lone canvass report documenting Langley's statements contained nothing of conspicuous importance, nor does it mention the Ballines. A reasonable jury could conclude that the members of the Ballines family were the truly important witnesses to question and that Grayson did not know, and was never informed, that the Ballines may have relevant information. Here, the only information Grayson received relating to either Langley or the Ballines was that Langley heard six gunshots, observed a Black male wearing a white no sleeve shirt and black pants near her residence, and heard laughter. Without disclosure of the important details of Langley's unrecorded statement, Grayson would have no reason to believe that she was an actual witness, much less an important witness, to aspects of the Laundromat shooting. Without any indication that Langley had

---

[11] The Defendants contend that Alvorado's testimony was totally impeached by Starks when he testified that Alvorado was not present when he was shot. Langley's account, however, would cast doubt on Starks's version of events as well.

material information to his defense, the Court cannot say that Grayson was obligated to interview her. *See Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001) ("the question is whether defense counsel had access to Brady materials contained in a witness's head. Because mind-reading is beyond the abilities of even the most diligent attorney, such material simply cannot be considered available in the same way as a document."). The Court concludes that Grayson's due process claim therefore survives summary judgment with respect to the Langley information.

There is also evidence in the record that Alvorado received some form of consideration in exchange for her cooperation and testimony regarding the Laundromat shooting, despite the Defendants' staunch position that there is not. (Dkt. No. 80, Nelson Dep. at 74: "Q: Do you have any knowledge or information about Marilou receiving any consideration for any testimony or statements she made back in 2000? A: Yes. But I couldn't tell you what. I remember one of the many updates John and Darrell would give me, I remember them mentioning something about some case she back at the time that she'd gotten some consideration on."). Because the Court does not weigh the evidence at the summary judgment stage, the Court accepts that Alvorado received something in exchange for her assistance on the Laundromat shooting and that the Defendants did not inform Grayson of the transaction. They needed to. *See United States v. Beck*, 625 F.3d 410, 419 (7th Cir. 2010) (a witness's bias is "always relevant"). Additionally, had Grayson questioned Alvorado on this issue, a reasonable jury could conclude that she would not have told him that she had received anything from the Defendants. She has consistently maintained that she did not receive anything in exchange for her statements. *See, e.g.*, *Jimenez v. City of Chicago*, 830 F. Supp. 2d 432, 445 (N.D. Ill. 2011) (drawing reasonable inferences in favor of plaintiff required finding that witness would not have told criminal defendant something

inconsistent with witness's testimony at trial). The Court therefore denies summary judgment on Grayson's due process claim for this reason as well.

### 2. Fabrication of Evidence & Unduly Suggestive Identifications

A fabrication of evidence due process violation occurs when a criminal defendant is harmed by "the police or prosecutor [who] manufactures evidence that he knows to be false." *Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014); *see Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014) ("*Fields II*"). On the other hand, where a Section 1983 plaintiff seeks to bring a due process claim based upon allegations that police coerced statements from witnesses, the plaintiff in actuality brings a malicious prosecution claim. *See Petty*, 754 F.3d at 421-22 (an officer "fabricating evidence that she knows to be false is different than getting 'a reluctant witness to say what may be true.' " (quoting *Fields II*, 740 F.3d at 1112)). Here, Grayson's allegations and evidentiary support fall within the malicious prosecution category rather than that of fabricated evidence. The record, even when viewed in the light most favorable to Grayson, does not demonstrate that the Defendants created evidence or testimony. Alvorado and Starks, the two witnesses who testified at Grayson's criminal trial, universally stated that the Defendants did not provide them with what to say or force them to make statements at trial that they knew to be untrue. While disputes of fact preclude the Court from concluding that the Defendants turned over all exculpatory and impeaching material, there nevertheless is no indication that the Defendants fabricated testimony for use at Grayson's criminal trial. *See Fields II*, 740 F.3d at 1110 ("Fabricated testimony is testimony that is made up; it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it.").

For these same reasons, there is also no evidence, aside from Grayson's speculation, that the Defendants used unduly suggestive procedures when presenting photo lineups to Starks and Alvorado. Although Starks's and Alvorado's delayed identifications of Grayson as the shooter were odd and potentially not credible (as addressed below), based on the evidence that they both knew him and knew him well, there is nevertheless no indication that the Defendants overtly pressured either witness, forced them to identify Grayson, or used inappropriate photo spreads. *See Alexander*, 433 F.3d at 555-56 ("A plaintiff with this kind of claim must demonstrate . . . that unduly suggestive identification procedures led to an unreliable identification that undermined the fairness of the trial . . . Simply saying that a witness was shown a suggestive photo array or lineup and later testified is not enough."). The Court therefore grants summary judgment on Grayson's allegations relating to suggestive identification procedures.

### 3. Coerced False Confession

Grayson contends that the conditions surrounding his custodial interrogations were unduly coercive and led to false inculpatory statements brought out by the Defendants. The Defendants maintain that the record belies Grayson's coerced confession claim and that, even if there were factual disputes, his claim is time-barred. A review of Grayson's testimony concerning his interrogations with Wallers and West and the criminal trial mandate a denial of summary judgment in this regard.

The voluntariness of a confession "is a question of fact to be determined from the totality of all the circumstances." *Schnechloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *see also, e.g.*, *Hyung Seok Koh v. Graf*, No. 11 CV 2605, 2013 WL 5348326, at *5 (N.D. Ill. Sept. 24, 2013). The due process clause can apply to coerced confessions when the circumstances of the interrogation are grossly inappropriate. *See Chavez v. Martinez*, 538 U.S. 760, 774 (2003). This

is because "[a] conviction obtained by the use of an involuntary confession violates due process." *United States v. Stadfeld*, 689 F.3d 705, 709 (7th Cir. 2012).

A confession is voluntary and admissible where the totality of the circumstances demonstrate that "it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Vallar*, 635 F.3d 271, 281 (7th Cir. 2011) (citation and internal quotation marks omitted). The Court weighs a number of factors when making this determination and here, under Grayson's version of the facts, *see Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003), a reasonable jury could find that the Defendants overrode Grayson's limited willpower and induced him to make false inculpatory statements.

First and foremost, Grayson testified that Wallers and West told him he could go home in exchange for "helping them" and giving them the name of the shooter. Grayson attempted to comply by placing himself in the crime and telling the officers that he was present at the Laundromat when Adrian Moore shot Miller and Starks, but the officers refused to accept his narrative. Although there is nothing improper about delving deeper into Grayson's alibi in theory, falsely promising lenience is enough to create a jury question over whether Grayson's will was overborne in the course of his interrogation. *See Stadfeld*, 689 F.3d at 709 ("A false promise of lenience is an example of forbidden [interrogation] tactics, for it would impede the suspect in making an informed choice as to whether he was better off confessing or clamming up." (citation and internal quotation marks omitted)). Though this conduct in and of itself is enough, Grayson testified to a litany of other conditions that hampered the voluntariness of his inculpatory statements. He testified that large portions of his custodial interrogation took place unrecorded, that he was intoxicated initially, that he was constantly "starving" and denied food

when he would ask for more, that the room in which his interrogation began was so hot and uncomfortable that eventually Wallers and West moved him to a different room, that he was kept from sleeping intermittently in the 67 hours he was held in custody, and that he had a mental breakdown at one point where he began praying and swearing he did not commit the crime. According to Grayson, despite knowing all this, Wallers and West lied to him about evidence implicating him, manipulated him by promising him he would be released if he could provide the shooter, and fed him details of the crime in an effort for him to extrapolate on details that only an individual present at the shooting would know. On top of this, while Grayson scored an overall I.Q. of 89, he scored well below the mean regarding his understanding of the protections related to the right to remain silent. *See Smith v. Duckworth*, 910 F.2d 1492, 1497 (7th Cir. 1990) ("[W]hile a finding of involuntariness cannot be predicated solely upon [an individual's] mental instability, his mental state is relevant to the extent it made him more susceptible to mentally coercive police tactics[.]") (citation and internal quotation marks omitted)). The psychiatrist who conducted the evaluation testified that Grayson would not understand statements the same way an average person would and would be more trusting than most. Grayson also testified that he had only a sixth grade education.

Read together and taken in conjunction with Grayson's statements that Wallers and West intentionally fed him details of the crime and only recorded his interrogation sessions when his statements matched what they told him, a reasonable jury could conclude that his "will was overborne at the time he confessed." *See Reck v. Pate*, 367 U.S. 433, 440 (1961) (citations omitted); *see also Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) (actual violence not required for a finding of coercion); *Andersen v. Thieret*, 903 F.2d 526, 530 (7th Cir. 1990) ("Food, sleep, and water deprivation and a mentally coercive interrogation would also have caused the state

courts to conclude that [a] confession was involuntary.") (citations omitted)). This question will therefore go to the jury.

Although two witnesses, Alvorado and Starks, both testified at Grayson's trial in addition to the prosecution playing Grayson's recorded statements, their testimony was inconsistent and conflicted with that of the other. The Illinois appellate court went as far as to recognize that Alvorado's and Starks's testimony and rendition of events conflicted but that "resolving such issues is the function of the jury[.]" (Pl. Resp. ¶ 94.) Accordingly, the Court cannot say as a matter of law that Grayson's shifting, inculpatory statements did not play a major role in his conviction. Additionally, viewing all disputed facts in the light most favorable to Grayson as the Court must, the Defendants fed Grayson substantial portions of his inculpating statements and they were untrue. For these two reasons, Grayson's coerced confession allegations are timely. *See, e.g.*, *Chatman v. City of Chicago*, No. 14 C 2945, 2015 WL 1090965, at *5 (N.D. Ill. Mar. 10, 2015) (where a plaintiff "alleges a coerced false confession and the subsequent use of any resulting incriminating statements in the criminal proceeding, the *Heck* accrual rule applies, and the claim will not be deemed to have accrued until the underlying conviction is invalidated or otherwise nullified"); *Taylor v. City of Chicago*, 80 F. Supp. 3d 817, 826 (N.D. Ill. Feb. 19, 2015) (where success on constitutional claim would imply invalidity of conviction, the *Heck* rule precludes a plaintiff from raising his claim before his conviction is overturned). Grayson's conviction was vacated in 2012 and he instituted this lawsuit in 2013. The aspect of his due process claim that rests on the circumstances surrounding his inculpatory statements is therefore timely because he had two years from the date his conviction was thrown out to file. *See Ashafa v. City of Chicago*, 146 F.3d 459, 461 (7th Cir. 1998) (for Section 1983 statutes of limitations purposes, federal courts adopt the forum state's statute of limitations for personal

injury claims); *see also Dominguez v. Hendley*, 545 F.3d 585, 588 (7th Cir. 2008) (statute of limitations for personal injury actions in Illinois is two years).

Because genuine issues of disputed fact cloud whether the Defendants unduly coerced Grayson into placing himself in the crime, the Court denies summary judgment on his due process claim for this reason as well.

### 4. Qualified Immunity

The Defendants' qualified immunity argument is truncated and essentially merely describes the general law concerning the availability of the defense. *See de la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 688 (7th Cir. 2008) ("[U]nsupported and undeveloped arguments are waived.") (citation omitted)). Despite the Defendants' failure to properly substantiate their qualified immunity defense in general, a more fundamental issue plagues their argument: they only address qualified immunity in the context of fabricated offense. (Dkt. No. 179 at 54.) Grayson's due process claim entails not only alleged fabrication of evidence, but also that the Defendants failed to disclose favorable evidence, used unduly suggestive identification procedures, and coerced him into giving a false inculpatory statement. Because the Defendants' did not argue that they are entitled to qualified immunity regarding Grayson's *Brady* and coerced confession claims, they have waived that argument.

Waiver aside, any properly supported qualified immunity argument with respect to Grayson's *Brady* allegations would fail. The Court applies a two-part test when determining if a government actor is entitled to qualified immunity. "First, a court must decide whether the facts that a plaintiff has alleged make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555

U.S. 223, 232 (2009) (internal citations and quotation marks omitted). The Court has previously concluded that the record contains enough evidence for Grayson to satisfy the first step at this stage, so it turns to the second.

When allegations revolve around whether police officers failed to disclose *Brady* evidence, the qualified immunity question focuses on whether it was clearly established that the information that Grayson contends the Defendants failed to disclose had to be turned over as exculpatory or impeaching. *See Carvajal*, 542 F.3d at 569. Because "[t]he *Brady* principle was announced in 1963," the only issue is "whether the defendants should have recognized the information as exculpatory or impeaching." *See, e.g.*, *Jimenez*, 830 F. Supp. 2d at 449 (citing *Newsome*, 256 F.3d at 752-53). Here, the Court finds that, viewing the disputed facts in the light most favorable to Grayson and therefore presuming the Defendants (1) were in possession of the entirety of the Langley information including, most importantly, the reference to the Ballines residence and (2) the Defendants compensated Alvorado in some way for her testimony, the Defendants should have known that the evidence was impeaching in both instances and needed to be disclosed. The testimony at Grayson's criminal trial was that he was alone throughout the incident and ran off after shooting Miller and Starks. A different rendition that involved two shooters who stayed around the area of the Laundromat and slinked off after the police presence waned, at the very least, severely impeaches both Alvorado's and Starks's accounts of the incident. Most importantly, as noted above, was the Defendants' failure to provide Grayson with the information that the two individuals were at the Ballines residence after the shooting. Langley's potential recount to the non-emergency number was extremely detailed and credible and no reasonable police officer could fail to see that it was highly impeaching of the other witnesses' versions. The fact that Alvorado may have received something in exchange for her

testimony leads to the same conclusion. *See United States v. Abel*, 469 U.S. 45, 52 (1984) ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."); *see also United States v. Parker*, 716 F.3d 999, 1010 (7th Cir. 2013).

### B. Supervisory Liability Claim

Grayson does not oppose the Defendants' motion with respect to his claim for supervisory liability. The Court accordingly dismisses this claim.

### C. Failure to Intervene Claim

The Defendants' brisk argument for summary judgment on Grayson's failure to intervene claim rests on a contingent finding that Grayson's due process claim fails. Because the Court declines to grant summary judgment on the majority of the due process claim, the Court similarly denies the Defendants' motion with respect to the failure to intervene claim.

### D. Conspiracy under Section 1983 Claim

In his second amended complaint, Grayson brought a conspiracy claim, alleging that the Defendants reached an internal agreement to frame Grayson for the Laundromat shooting and deprive him of his constitutional rights. The Defendants argue that because there is no evidence of an underlying constitutional violation or evidence of an agreement amongst themselves, Grayson's conspiracy claim fails. The Court has already concluded that the former argument is unsuccessful, but the latter has merit.

First and foremost, Grayson did not offer any meaningful response to the Defendants' position that there is no evidence of an agreement and therefore waived any argument. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (failure to respond to argument results in

waiver). Waiver aside, the Defendants are entitled to summary judgment on Grayson's conspiracy claim on the record before the Court. A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means." *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988). To establish conspiracy liability in a Section 1983 claim, Grayson must show that "(1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *See Beaman*, 776 F.3d at 510 (citation omitted). Although viewing the material facts in the light most favorable to Grayson leads to a conclusion that the overt acts requirement is satisfied by the failure to disclose exculpatory evidence, the record does not reflect any mark of an agreement amongst the Defendants to commit these *Brady* violations. This is true despite the fact that "conspiracies are often carried out clandestinely" and "plaintiffs can use circumstantial evidence to establish a conspiracy" because "such evidence cannot be speculative. *See id.* at 511 (citing *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003)). Grayson does not attempt to point to any circumstantial evidence here aside from the *Brady* violations themselves. The Court therefore grants the aspect of the Defendants' motion aimed at Grayson's federal conspiracy claim.

### E.     Malicious Prosecution Claim

In order to prove malicious prosecution pursuant to Illinois law, a plaintiff must establish the following elements: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996). The Defendants here contend that Grayson's malicious prosecution claim fails because probable

cause for his prosecution and conviction existed and because Grayson cannot demonstrate any evidence of malice.

Probable cause is a complete defense to a claim for malicious prosecution. *See Logan v, Caterpillar, Inc.*, 246 F.3d 912, 926 (7th Cir. 2001). "Probable cause is defined as a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Id.* (citation and internal quotation marks and annotations omitted). While a single credible witness is enough to find probable cause, *see Holmes v. Vill. Of Hoffman Estates*, 511 F.3d 673, 680 (7th Cir. 2007), where there exist disputed facts concerning a witness, the Court "adopt[s] the plaintiff's version of the disputed facts for which there is some support in the record." *Logan*, 246 F.3d at 926. When deciding this question on a motion for summary judgment, courts "must give the non-moving party the benefit of conflicts in the evidence about what the officers actually knew at the time." *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015).

The Defendants argue that although they had no physical evidence tying Grayson to the Laundromat shooting, they had two credible eyewitnesses: Alvorado and Starks. The circumstances surrounding both witnesses, however, raise genuine issues of material fact over the credibility of the witnesses' statements and reasonableness in relying on those statements that make a finding of probable cause as a matter of law inappropriate.

First and foremost, Alvorado's eyewitness statement that she saw the shooter at the time of the incident is fraught with credibility and reliability concerns. Most fundamentally, there are genuinely disputed facts regarding whether Alvorado even saw the shooting. *See, e.g.*, *Jimenez*, 830 F. Supp. 2d at 450 (citing *Kincaid v. Ames Dep't Stores*, 670 N.E.2d 1103, 1110 (Ill. App. Ct. 1996) (witness statements supporting probable cause must be reliable). Here, while

Alvorado claims that not only was she present for the shooting, but also that the shooter pointed his weapon at her and attempted to fire, Starks has consistently testified that she was not present for the actual shooting. (Pl. Ex. 20, Starks Trial Testimony at 2477: "Q: How long after you were shot did she come back? A: I think it was about ten minutes, maybe. Q: So, she wasn't even there when the shooting took place? A: She was - - no, she was like - - she wasn't there.") An entirely reasonable inference to take from this fact is that Starks told the Defendants that Alvorado was not present for the shooting and therefore unqualified as an eyewitness to the incident. Additionally, Alvorado's eventual identification of Grayson itself raised factual questions concerning its credibility. Alvorado later testified that not only did she know who Grayson was, but that he essentially lived in her home for a matter of months. Despite this intimate knowledge, Alvorado did not name Grayson at the shooter the first few times she interacted with Wallers, and in fact, told both the Defendants and other individuals that the shooter was not Grayson, by stating that the shooter "looked like Flip, but was taller." This, plus the fact that Grayson contends that Alvorado's identification was only recorded after she recognized him in a photo spread, makes the credibility of Alvorado's identification a question for the jury. *See Hart*, 798 F.3d at 588 ("Turning on the tape recorder only after the witnesses said they recognized someone in the photo array presents an incomplete picture of the witnesses' interaction with the police.") (citation omitted)). The Defendants argue that Alvorado's delayed identification can be chalked up to fear because Grayson was not in custody the first few times Alvorado was interviewed. This argument, while certainly plausible, is belied by Alvorado's identification of Greene despite the fact that he was not in custody. More importantly, however, this raises the exact kind of credibility issue that is reserved for the trier of fact. *See Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007) ("On summary judgment a court may not make credibility

determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.") (citations omitted)).

Starks's identification, albeit a closer call, likewise presents factual issues regarding its credibility and reliability. According to Alvarado, Starks knew Grayson well and spent time with him at Alvarado's house frequently. Accepting this fact in the light most favorable to Grayson, which here would be that Starks did know Grayson, his delayed identification is odd and there is no record evidence whatsoever where he or any officer explains why Starks was unable to tell officers who the shooter was right away. In addition, Munn, an Aurora officer himself, testified that he did not find Starks's identification credible based on other witness reports, the area of the shooting, and the lack of lighting in the alley. "The question of probable cause is typically a proper issue if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013-14 (7th Cir. 2006) (internal quotation marks omitted)). Based on the testimony of Aurora police officers themselves, that is the case here.

Without the identifications of Alvarado or Starks, the Defendants had little, if anything, to base their charge on. Because the Court is not convinced that the undisputed facts conclusively show that probable cause to charge Grayson was present, the question of whether the Defendants had probable cause to charge and prosecute Grayson will remain for the jury.

Regarding the Defendants' second challenge, "[m]alice is defined as the initiation of a prosecution for any reason other than to bring a party to justice." *Rodgers v. Peoples Gas, Light & Coke Co.*, 733 N.E.2d 835, 842 (2000). The lack of probable cause, alone, does not establish malice, "but the trier of fact may infer malice from lack of probable cause if there is no other credible evidence which refutes the inference." *See id.* The Defendants argue that because

they created a photo lineup containing Adrian Moore and looked into a separate shooting that involved matching bullet casings from the Laundromat shooting, there is no evidence of malice.

The Court finds that there is enough evidence, when viewed in the light most favorable to Grayson, to give rise to a genuine issue of fact concerning whether the Defendants acted with malice in pursuing Grayson's prosecution. First, in Grayson's interrogations, he told Wallers and West, against his own interest, that Greene had put Grayson and Adrian Moore up to the Laundromat shooting, yet the officers did not interview either individual.[12] The officers made photo spreads with their pictures in them but did little to further investigate. Moreover, accepting Langley's statement to the Aurora police, there is no evidence that the Defendants followed up with any member of the Ballines' residence, despite Langley's detail account. A reasonable jury could decide from this evidence that the Defendants acted with malice. The Court therefore denies the Defendants' motion with respect to Grayson's malicious prosecution claim.

### F.     Negligent Supervision Claim

Grayson does not oppose the Defendants' motion with respect to his claim for negligent supervision. The Court accordingly dismisses this claim.

### G.     Conspiracy under Illinois Law Claim

For the same reasons the Court grants summary judgment on Grayson's federal conspiracy claim, it correspondingly grants summary judgment to the Defendants on his state conspiracy claim.

---

[12] Additionally and as discussed at length above, Grayson testified that Wallers and West fed him testimony and coerced a false confession out of him. If a jury believed Grayson's account, and a reasonable jury could, this could constitute evidence of malice as well. *See,e.g.*, *Jimenez v. City of Chicago*, 877 F. Supp. 2d 649, 667 (N.D. Ill. July 11, 2012) (where jury could infer that police told suspect what to say in interrogation, such evidence would tend to establish malice) (citing *Aguirre v. City of Chicago*, 887 N.E.2d 656 (Ill. App. Ct. 2008)).

### H.     Intentional Infliction of Emotional Distress Claim

Grayson alleged that, in the course of his arrest, interrogations, and prosecution, the Defendants subjected him to the intentional infliction of emotional distress. The Court grants the Defendants' motion for summary judgment on this claim because Grayson's claim is untimely. In Illinois, the Tort Immunity Act imposes a one-year statute of limitations period on intentional infliction of emotional distress claims. *See* 745 ILCS 10/8-101(a). Claims for intentional infliction of emotional distress stemming from an arrest or prosecution accrues on the date of the arrest.[13] *See Bridewell v. Eberle*, 730 F.3d 672, 678 (7th Cir. 2013); *see also, e.g.*, *Chatman*, 2015 WL 1090965, at *9; *Barrow v. City of Chicago*, No. 13 C 8779, 2014 WL 1612712, at *6 (N.D. Ill. Apr. 21, 2014). Here, the Aurora police arrested Grayson on August 26, 2000, but he did not raise his intentional infliction of emotional distress claim until March 5, 2013. (Dkt. No. 1.) His claim is therefore untimely and the Court grants the Defendants' motion in this regard.[14]

### I.     Respondeat Superior Claim

Grayson does not oppose the Defendants' motion with respect to his claim for respondeat superior. The Court accordingly dismisses this claim on this basis and because respondeat superior is not available as a remedy under Section 1983. *See Shields v. Ill. Dep't of Corrections*, 746 F.3d 782, 790 (7th Cir. 2014) ("respondeat superior is not a basis for rendering municipalities liable under § 1983 for the constitutional torts of their employees") (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 663 n.7 (1978)).

---

[13] The Seventh circuit additionally foreclosed the argument that intentional infliction of emotional distress constitutes a continuing tort or violation. *See Bridewell*, 730 F.3d at 678.

[14] Grayson cites to another court in this District for the proposition that intentional infliction of emotional distress claims accrue after the invalidation of the underlying conviction. *See Rivera v. Lake County*, 974 F. Supp. 2d 1179, 1180 (N.D. Ill. 2013). However, as stated above, the Seventh Circuit has conclusively decided the issue.

### J.     Indemnification Claim

The Defendants' sole argument for summary judgment on Grayson's indemnification claim is that there is no underlying liability. The Court has denied the Defendants' motion with respect to the underlying violations and therefore denies the Defendants' motion with respect to Grayson's indemnification claim as well. Moreover, Illinois law makes local municipalities, including the City of Aurora, liable for the payment of any tort judgments entered against one of its employees so long as the employee was acting within the scope of his employment. *See* 745 ILCS 10/9-102; *see also Argento v. Vill. Of Melrose Park*, 838 F.2d 1483, 1484 (7th Cir. 1988) (abrogated on other grounds) (citing *Estate of Ahmed v. Cook County*, 497 N.E.2d 346, 347 (Ill. App. Ct. 1986)); *see also, e.g.*, *Griffin v. Meagher*, No. 09 CV 1477, 2009 WL 5174684, at *5 (N.D. Ill. Dec. 21, 2009). A Section 1983 judgment qualifies as a "tort judgment" within the meaning of the Illinois statute. *See Scott v. O'Grady*, 975 F.2d 366, 372 (7th Cir. 1992). Because Grayson's due process claim, brought pursuant to Section 1983, is moving forward, his indemnification claim survives as well.

### K.     Spoliation Claim

Grayson brought an Illinois state law spoliation claim for the missing Urzua letter. Grayson contends that "[t]he facts surrounding the missing Urzua letter are damning[,]" and that it is impossible to believe that Wallers did not read the letter when he had access to it. (Dkt. No. 187 at 51-52.) To prove a spoliation claim, a plaintiff must demonstrate that: "(1) the defendant owed the plaintiff a duty to preserve the evidence; (2) the defendant breached that duty by losing or destroying the evidence; (3) the loss or destruction of the evidence was the proximate cause of the plaintiff's inability to prove an underlying lawsuit; and (4) as a result, the plaintiff suffered actual damages." *Martin v. Keeley & Sons, Inc.*, 979 N.E.2d 22, 27 (Ill. 2012).

The Defendants contend that Grayson is unable to establish a material issue of fact with respect to the first or third elements. Reasonable minds could disagree over whether the Defendants had a duty to preserve the Urzua letter, but because the record is absolutely devoid of any evidence indicating that Grayson will be unable to succeed on his underlying civil action absent use of the Urzua letter, the Court grants the Defendants' motion on his spoliation claim.

At the outset, the Court notes that Grayson failed to address the Defendants' challenge to his ability to prove the third element of his spoliation claim and has accordingly waived any argument. *See Bonte*, 624 F.3d at 466. Nevertheless, there is no genuine dispute that the Urzua letter is not necessary for Grayson to prove his claims, despite the impossibility of knowing precisely what the letter said. "A claim of spoliation of evidence is connected to the merits of the underlying suit." *Borsellino v. Goldman Sachs Group., Inc.*, 477 F.3d 502, 510 (7th Cir. 2007). The record before the Court presents no evidence or inference that Grayson will be unable to prove his due process and malicious prosecution claims absent evidence of the Urzua letter. *See Boyd v. Travelers Ins. Co.*, 652 N.E.2d 267, 271 (Ill. 1995) (where plaintiffs were "deprived of the key piece of evidence in their products liability lawsuit," spoliation claim could proceed); *see also, e.g.*, *Zorn v. Zimmer, Inc.*, 486 F. Supp. 2d 724, 726 (N.D. Ill. 2007). Instead, the pertinent pieces of evidence at trial will be Langley's account of the incident, the Defendants' failure to disclose the contents of her non-emergency phone call to Grayson, the Defendants' failure to raise the Ballines' involvement with the two individuals who suspiciously left the area after the shooting, Alvorado's receipt of consideration in exchange for her testimony, the circumstances surrounding Grayson's interrogations, and Alvorado's and Starks's identifications of Grayson as the shooter. The Urzua letter, while potentially leading to the vacating of

Grayson's conviction, cannot be said to be pertinent to Grayson's claims against the Defendants on this record. The Court therefore grants summary judgment on Grayson's spoliation claim.[15]

### L. Conspiracy to Deny Access to Courts Claim

The Defendants contend that Grayson's claim for conspiracy to deny access to courts is merely a restyled incantation of his state law spoliation claim. Grayson agrees with this characterization and offers no argument against summary judgment aside from reincorporating his state law spoliation position. The Court therefore grants summary judgment on this claim for the same reasons it granted summary judgment on Grayson's spoliation claim.

---

[15] The Court's ruling does not foreclose the possibility of Grayson pursuing a missing evidence instruction at trial. *See Russell v. Nat'l R.R. Passenger Corp.*, 189 F.3d 590, 595-96 (7th Cir. 1999).

## CONCLUSION

"Where the parties present two vastly different stories—as they do here—it is almost certain that there are genuine issues of material fact in dispute." *Payne*, 337 F.3d at 770. For the reasons stated herein, the Court grants in part and denies in part the Defendants' motion for summary judgment (Dkt. Nos. 159 & 177). Specifically, the Court grants summary judgment in favor of the Defendants on Grayson's (1) due process claim to the extent it relies on fabricated evidence or unduly suggestive identification procedure allegations, (2) supervisory liability claim, (3) federal and state conspiracy claims, (4) negligent supervision claim, (5) intentional infliction of emotional distress claim, (6) respondeat superior claim, (7) spoliation claim, and (8) conspiracy to deny access to courts claim. The Court denies summary judgment on Grayson's (1) due process claim to the extent it relies on *Brady* violations and coerced confession allegations, (2) failure to intervene claim, (3) malicious prosecution claim, and (4) indemnification claim.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: January 17, 2016